tions involved should be settled by judicial determination in this court rather than by a resort to summary proceedings. I do not decide that the defendant must regrade the locus because it is not clearly proven to what extent, if any, the present irregularity of the surface, after defendant's encroachments be removed, is due to defendant's acts. Some material part thereof must be due to the plaintiff's own acts in dumping material thereon as above stated.

I may add that the task of considering and deciding this case has been one of very great interest, as well as of much labor, calling, as they seemed to me to call, for the investigation of matters of much historical interest, at least locally, and as well of matters of fact and law not often arising.

(159 App. Div. 649.)

WELDON v. NEW YORK, N. H. & H. R. CO.

(Supreme Court, Appellate Division, First Department. December 19, 1913.)

1. CARRIERS (§ 286*)—CARRIAGE OF PASSENGERS—WALKS.

The obligation of a railroad company to keep walks leading to its trains in a safe condition should be measured by the same standards as that of a municipal corporation to care for its sidewalks and streets.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1142–1148, 1150–1152; Dec. Dig. § 286.*]

2. CARRIERS (§ 286*)—CARRIAGE OF PASSENGERS—DEPOT.

Where plaintiff fell on a concrete step maintained by the defendant railroad company, as part of a flight of stairs leading down to its train shed, the fact that the step slanted some and was smooth will not establish the railroad company's liability, where it was shown that no other accident had occurred, and that plaintiff was familiar with the step; a person using such steps being bound to exercise care to keep from slipping.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1142–1148, 1150–1152; Dec. Dig. § 286.*]

3. CARRIERS (§ 318*)—CARRIAGE OF PASSENGERS—INJURIES TO PASSENGER.

In an action by a passenger who fell on a walk leading to the railroad company's train shed, evidence *held* insufficient to establish the defect in the walk relied upon.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1270, 1307–1314; Dec. Dig. § 318.*]

Appeal from Trial Term, New York County.

Action by James Weldon against the New York, New Haven & Hartford Railroad Company. From a judgment for plaintiff and an order denying a new trial, defendant appeals. Reversed and remanded.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Charles M. Sheafe, Jr., of New York City (J. M. Gibbons, of New York City, of counsel), for appellant.

Lewis E. Carr, Jr., of Albany (W. K. Barton, of New York City, of counsel), for respondent.

CLARKE, J. The complaint alleges that on the 23d of July, 1910, at about 7:45 a. m., plaintiff, at the Van Nest station of the defendant, was on his way, as a passenger, to the place where passengers board

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

defendant's cars, and while within his rights as a passenger was obliged to go down a pair of stairs, and in doing so his foot slipped from under him, and he fell to the bottom of some 20 steps, without any fault on his part, and solely through the wrongful and negligent act of the defendant keeping and maintaining a smooth, slippery, and defective step or tread in said stairs.

In his bill of particulars, plaintiff set forth:

"The step or tread in the stairs was defective in that it was worn smooth to such an extent as to render it unsafe and dangerous to persons passing up and down said stairs."

Upon the trial this paragraph was amended so as to include the word "slanted."

The plaintiff was a carpenter 66 years of age. His own account was as follows:

"I went to Van Nest station, to the top of the stairway. I went into the depot, purchased two tickets to Bartow. * * * So, in going out I was going down to the subway. I slipped on this concrete step and fell to my left down the stairs, and landed at the bottom of the stairs. I fell continuously from the time I slipped on this step right down to the bottom step. I walked along this pathway from the station to the stairway. I had plenty of time; I walked slow. I had been over that ground before. I happened to be walking slowly this day because I had lots of time to get the train. I walked slowly to the head of the steps, and I slipped and fell. I slipped on the concrete step and fell to my left and fell down the stairs to the bottom. Q. That is all you know about the accident, is it, the happening of the accident? A. That is all I know."

He, therefore, places himself as walking down the pathway from the station to the stairway and slipping on the top step and falling down to the bottom step.

Mr. Murphy testified that about 9:30 o'clock he found the plaintiff at the station, and he and one Cahill took him home.

"He pointed out a stone that was a part of the stairway. It is used as a part of the stairway. It was slanting about an inch and a half, I should judge to the best of my belief at that time, leaning towards the platform of the stairs. There is a joint there; about 6 or 7 feet long the stone is, and the joint is broke to this side [indicating]. There was no tread on that stone at all. Q. On the top of the step, what was the condition of the top of the step? A. It was leaning towards the platform. * * * It was smooth. It is smooth to-day. It was a little damp, one of them muggy mornings in July. * ·* * The pathway from the door of this station house to this step or coping in question was kind of a cinder path. * * * There was not any other passageway provided for passengers except over this coping or steps and down into the tunnel.

"The Court: Is this the first step of the stairway? A. Yes. It was on top, the top of that was not protected by any metal tread; no tread onto it. It is there to-day. my friend. The type of the treads on the other stairs are all right, apparently."

Whereupon the following colloquy occurred:

"Mr. Gibbons (defendant's counsel): I would like to know whether Mr. Barton now claims that the steps were slanting or whether the platform at the top of the stairs was slanting. We have had an impression taken of every step on the flight.

"The Court: I assume it refers to the first step.

"Mr. Barton: It refers to a step or coping which is a part of that step and at right angles to the main treads going down.

"The Court: Affecting particularly the first one at the head?

"Mr. Barton: Just, one step. It was necessary to go across that step, then step onto the landing, and then make a sharp turn to the left to go down to the tunnel."

The witness continuing under cross-examination:

"This was not a step, my friend. It is a coping on the wall there used as a step. There is a wooden step inside. Q. It is not a part of the stairway at all? A. It is a side part of the stairway. Q. Is it a step or not? A. They use it as a step.

"The Court: Do you agree or disagree on the question?

"Mr. Gibbons: I do not really understand yet where this witness is putting it.

"The Court: Go ahead and cross-examine.

"Mr. Gibbons: And I do not see what right this witness has to place this accident. He came up there an hour and a half after it.

"The Court: He is not placing any accident. He is describing the condition of the steps.

"Mr. Gibbons: Unless he narrows it down to the point where the accident happened, I object to it, and move to strike it out.

"The Court: It is hearsay testimony on where the accident happened.

"Mr. Barton: But we have proved that the injured man pointed out the step that he slipped on. Now we are proving by him who came there later the condition of it.

"Mr. Gibbons: As I understood the plaintiff to testify, he said he slipped on the top step. * * * Q. (to the witness) Will you look at that photograph and see if you see the coping that you speak of there? A. I cannot see the coping here. * * *

"The Court: When you say 'the coping' you are referring to the spot that was pointed out as the place where the man fell?

"Mr. Gibbons: Yes.

"The Court: (To witness) Do you understand it that way? A. That is the way I understand it.

"The Court: It does not show on the picture? A. No."

So that we have the witness who claims to have had the plaintiff point out the place where he fell two hours after the accident placing it at the end of the cinder pathway from the station to the stairway. And this, at that stage of the trial, was the claim of counsel and the understanding of the court.

Notwithstanding the fact that the plaintiff and the man to whom he pointed out the locus in quo of the accident, both fixed it at the end of the path and the beginning of the stairway. Penn, a police officer, was put upon the stand for the plaintiff, and after testifying that he had used that station during the spring and summer of 1910 mostly every day, described a step about halfway down the stairs, probably 19 or 20 steps from the street, which he claimed, according to his judgment, slanted, the slant being about an inch and a half, making one end of the step that much lower than the other, at which the court said:

"This is not where the accident occurred, is it?

"Mr. Barton: The accident occurred right on this coping or stone step at right angles to the platform. * * *

"The Court: I frankly confess to you to-day I have not got it.

"Mr. Barton: The witness pointed out the particular concrete step in question to the witness Murphy. Now I am going to prove by this officer that he often used that, and the condition at the time of the accident.

"The Court: Was there only one concrete step in this whole arrangement, witness? A. No, probably there is 40 concrete steps leading down the stairway. * * *

"The Court: I understand the attempt in the first instance was to show that the defect in this situation was from the first step along the concrete stairway?

"Mr. Barton: No, sir; not the first step.

"The Court: But the coping that leads to this first step?

"Mr. Barton: Yes."

And nevertheless a large amount of testimony was taken from this witness as to the step or coping, which he placed 19 steps down.

Loehmann, another police officer, also testified as to a step which slanted at one end, according to his judgment, about an inch and a half.

So that evidence was given of the condition of a concrete step from five to seven feet long, which was depressed at one end about an inch and a half lower than at the other end; the evidence leaving the question as to whether the different witnesses were talking about the same step in the greatest degree of uncertainty, as well as to whether it was from this step that the plaintiff fell. It will be noted that the only defect specified in the complaint and in the bill of particulars as served was the smoothness of the step, and that the slant, which cut so large a figure in the evidence upon the trial, was put into the bill of particulars upon the trial, and presumably after conference with these witnesses, who were not present at the time of the accident, and whose sole knowledge of the place thereof was based upon hearsay. The plaintiff, who alone could know anything about the accident of his own knowledge, simply testified that he slipped on the top step and fell to the bottom, and that is all he knew about it, and that is probably the truth.

[1] But assuming that all of the testimony was given in regard to the particular step from which he fell, and that it was true, and that it did slant from one end to the other to the amount testified to, the obligation of a railroad corporation in regards to its depot and grounds is expressed in Bateman v. N. Y. C. & H. R. R. R. Co., 47 Hun, 429:

"The walk upon which the plaintiff was injured was maintained by the defendant upon its own land as a sidewalk for passengers coming and going between its depot and the public street. We think the measure of care due from the defendant to its passengers whom it invites to use it is the same as is required of a municipal corporation with respect to its public sidewalks, which it is required by law to maintain. * * * It is reasonable care and diligence measured by the circumstances of each case."

The Court of Appeals in Palmer v. Penn. Co., 111 N. Y. 488, 18 N. E. 859, 2 L. R. A. 252, a case involving the presence of ice and snow upon a station platform, said:

"We are not referred to any case laying down the precise degree of care and diligence required of such corporations under such circumstances; but we think it must be somewhat analogous to that imposed upon municipal corporations, in respect to the removal of snow and ice from public streets."

[2, 3] The rule in regard to municipal corporations is expressed in Butler v. Village of Oxford, 186 N. Y. 444, 79 N. E. 712, in a case of an accident on a sidewalk where the surface of the stone and ad-

joining dirt sidewalk were not flush at that junction; the surface of the former rising above the latter by a distance of 2½ inches in the center and about 5 inches upon the outer edge of the walk. The court said:

"There not only was no evidence that anybody else had ever stumbled at this point, but, upon the other hand, there was evidence of the use of this walk by a large number of people at about the same time when plaintiff fell, and also of general use by the public at other times without any resulting accident. The general principles which govern the liability of a municipality in such an action as this are perfectly well settled. It is not an insurer, and is not expected to maintain walks and streets in such an absolutely perfect condition as to render an accident impossible, but is expected to use reasonable care and prudence in detecting and remedying any defect which it might be fairly anticipated would be dangerous and liable to cause an accident. * * * Weighing the facts here presented, we think it would be altogether too burdensome a rule if we should allow a village like this defendant to be held liable for so insignificant a defect as is here complained of" (citing Beltz v. City of Yonkers, 148 N. Y. 67, 42 N. E. 401; Hamilton v. City of Buffalo, 173 N. Y. 72, 65 N. E. 944; Getzoff v. City of New York, 51 App. Div. 450, 64 N. Y. Supp. 636; and Corson v. City of New York, 78 App. Div. 481, 79 N. Y. Supp. 604).

In Duffy v. City of New York, 149 App. Div. 478, 133 N. Y. Supp. 974, plaintiff slipped into a hole in the sidewalk several feet in circumference, and from three to six inches deep, according to the testimony of different witnesses. In reversing, this court said:

"The preponderance of the testimony is clearly that the hole at its deepest point was not more than three or four inches in depth, and this is not such a defect in the highway as will render the city liable for injuries suffered therefrom."

In the case at bar the testimony is that hundreds of people had used this stairway for a long time every day, and there is no suggestion that any other accident had ever occurred. So far as the smoothness of the step is concerned, in Kline v. Abraham, 178 N. Y. 377, 70 N. E. 923, where the plaintiff had slipped on a marble staircase in a store, which was described as "slippery as ice," "smooth as glass," and "highly polished," the court said, unanimously reversing a judgment for the plaintiff, that the motion to dismiss should have been granted:

"Marble, in the construction of public buildings, large fireproof hotels, and stores upon the floors and stairways, has been in common use for many years. The surface is smooth, and a person walking thereon is required to use care to avoid slipping. The same is equally true with reference to floors and stairs constructed of hard wood, especially where the surface has been polished, as in the case of many of our more expensive private residences, but heretofore the construction of such floors or stairways has not been considered to be dangerous, unlawful, or a nuisance. * * * In this case, as we have seen, the plaintiff was perfectly familiar with these stairs. She had been up and down the staircase at least twice daily, and must have known of its condition. It was an open, visible structure, having no latent, hidden, or unseen defects. It is not pretended that there was any foreign substance upon the steps to make them more slippery. If they were slippery by reason of their smoothness or polish, * * * she knew that the steps were not covered with rubber treads, carpets, or other material, and we think the risk incidental to their use was assumed by her."

Plaintiff was entirely familiar with this station and its stairs, as he was in the custom of using it twice a day.

I am of the opinion that the evidence did not satisfactorily establish the main defect relied upon at the trial at the locus in quo, and also, assuming that all the testimony given as to the condition of the step did apply to that from which the plaintiff slipped, a cause of action was not established.

The judgment and order appealed from should be reversed and a new trial ordered, with costs to the appellant to abide the event. All concur.